# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA PIPE AND EQUIPMENT CO., | Civil No. 11-2158 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S AND THIRD-PARTY DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |
| AMERON INTERNATIONAL CORPORATION, | |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| SNYDER & ASSOCIATES, INC. | |
| Third-Party Defendant. | |

Robert B. Bauer, **DOUGHERTY, MOLENDA, SOLFEST, HILLS & BAUER P.A.**, 7300 West 147th Street, Suite 600, Apple Valley, MN, 55124, for plaintiff.

Bernard E. Nodzon, Jr. and David A. Snieg, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN, 55402, for defendant and third-party plaintiff.

John A. Markert, **COLEMAN HULL & VAN VLIET, PLLP**, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN, 55437, for third-party defendant.

Plaintiff Minnesota Pipe & Equipment, Co. ("MN Pipe") brought this negligent misrepresentation action against defendant Ameron International Corporation ("Ameron"). Ameron, in turn, filed a third-party complaint against Snyder & Associates,

Inc. ("Snyder") for professional negligence, negligent misrepresentation, tortuous interference with contract, and indemnity and contribution.

In the course of bidding on a public works project, Ameron advised MN Pipe that pipe manufactured by Ameron was approved for use in the project. MN Pipe advised its customer S.M. Hentges & Sons, Inc. ("Hentges") to bid on the project using Ameron pipe as its basis for a price quote. Hentges' bid was chosen and Hentges was awarded the project, but Ameron pipe was subsequently rejected as not suitable for use on the project. As a result, Hentges was forced to use a more expensive type of pipe to complete the project.

Pursuant to an oral agreement between Hentges and MN Pipe, Hentges demanded payment from MN Pipe to cover the difference in cost between Ameron pipe and the more expensive pipe. MN Pipe complied, paying Hentges $247,135.00. MN Pipe now seeks reimbursement from Ameron for that payment, arguing that Ameron negligently misrepresented that its pipe was approved for use in the project. Ameron maintains that it advised MN Pipe that Ameron pipe was approved for use in the project because Snyder assured Ameron that Ameron pipe was approved. Snyder denies that it gave such approval to Ameron, but argues that even if it had, Ameron cannot recover on its claims.

Ameron has now moved for summary judgment against MN Pipe and Snyder has moved for summary judgment against Ameron.

# BACKGROUND

## I.  THE PARTIES

MN Pipe is a waterworks supply distributor incorporated in Minnesota.  (Am. Compl. ¶¶ 1-2, Aug. 1, 2011, Docket No. 2.)  Ameron is a water and wastewater supply manufacturer incorporated in California.  (Third-Party Compl. ("TPC") ¶¶ 1-2, Sept. 13, 2011, Docket No. 6.)  Snyder is an engineering firm incorporated in Iowa that provides comprehensive engineering and planning services to public agencies and private developers.  (*Id.* ¶¶ 3-4.)  Hentges, which is not a party to the present action, is a construction contractor specializing in public-works projects in the Midwest. (Am. Compl. ¶ 16); (TPC ¶ 16.)  Hentges was also one of MN Pipe's customers.  (*Id.* ¶ 15.)

This case involves a public works project in Polk County, Iowa called the Rock Creek Trunk Sewer Project, Segments 4 and 5 ("the project").  (TPC ¶ 11.)  Polk County retained Snyder as the engineer for the project.  (*Id.*)  As the engineer, Snyder coordinated the project, reviewed plans and specifications, and facilitated the bidding process for the project.  (Second Aff. of Bernard (B.J.) E. Nodzon, Ex. 1 (Dep. of Christoffer Pedersen ("Pedersen Dep. A") 17:15-19, 18:7-20), Sept. 21, 2012, Docket No. 31.)  Snyder also drafted the specifications for the project.  (Pedersen Dep. A 30:7-11.)  Snyder had sole discretion to determine whether a product or process met the specifications for the project.  (Aff. of John A. Markert, Ex. D (Iowa Urban Standard Specifications for Public Improvements Manual ("SUDAS Manual") Section 1.02 (A)), Aug. 31, 2012, Docket No. 25.)

## II.     THE PROJECT SPECIFICATIONS

The written project specifications mandated that the pipe materials to be used on the project were of the brand "HOBAS Pipe USA, Inc. or equal . . ." (Markert Aff., Ex. A.)  The specifications made no reference to Ameron pipe.  (Markert Aff., Ex. B (Dep. of Jay Warren ("Warren Dep.") 48:16-18).)  As such, in order for Ameron pipe to be used on the project, Snyder needed to approve its use.  (Warren Dep. 48:19-22.)

## III.    THE SUDAS

The SUDAS are the governing guidelines and specifications for standard construction materials and procedures in Iowa.  (Warren Dep. 41:25-42:5.)  Section 1.02 of the SUDAS is entitled "Alternate Processes, Equipment, or Materials."  (SUDAS Manual.)  It provides, in relevant part:

A.     General.  In order to establish a basis of quality for the work, performance, or economy of operation, certain processes, types of machinery and equipment, or kind of material may be referenced in the contract documents by designating a manufacturer by and referring to its brand . . .  **Such reference is not intended to foreclose other processes, equipment or materials that will in the sole discretion of the Engineer meet, or exceed, the designated standards** . . .

B.     Consideration.

1.     The Jurisdiction may consider alternate processes, equipment, or materials for those specified in the contract documents; however, it is only an indication that the Jurisdiction will not foreclose consideration of the bidder's/contractor's request, and is not an approval.  Following are the steps for consideration of alternate processes, equipment, or materials:

     a.     If a bidder/contractor desires to use alternate process-es, equipment, or materials, the bidder/contractor shall contact the Engineer to confirm the Jurisdiction would consider alternate processes, equipment, or materials for those as specified in the contract documents.

     . . .

     d.     If the bidder/contractor desires to use alternate processes, equipment, or materials for those as specified in the contract documents, **the bidder/contractor shall secure the written approval of the Engineer before entering an order therefore**.

     e.     **Proposed alternative processes, equipment, or materials that will in the sole discretion of the Engineer meet, or exceed, the designated standards will be given written approval to be used on the project** as an "Approve Equal" or "Equivalent" to the specified item.

(SUDAS Manual Section 1.02 (A)-(B)) (emphasis added).

Section 1.12 of the SUDAS Specifications provides, in relevant part:

**No oral agreement or conversation made or had with any officer, agent, or employee of the Jurisdiction**, and no informal written communication from any officer, agent or employee of the Jurisdiction, **occurring either before or after the execution of the contract, shall affect or modify any of the terms or obligations contained in any of the contract documents**.  Such oral contact and such informal writings shall be considered as unofficial information and in no way binding upon the Jurisdiction.

(SUDAS Manual Section 1.12) (emphasis added).

The following applicable terms are defined by the SUDAS:

**CONTRACTING AUTHORITY.**  The body, entity, board, commission, officer, or governmental entity having authority to award a contract.

**CONTRACT DOCUMENTS**.  **The contract documents consist of the following**: The notice to bidders and notice of public hearing; the

instructions to bidders; **special provisions; standard specifications; general supplemental specifications; supplemental specifications**; plans; addenda; proposal; contract; performance, payment, and maintenance bond; insurance certificate(s); Notice to Proceed; and change orders. **These documents form the agreement** whereby the Contractor will furnish all labor, equipment, tools, and materials, and perform all work necessary to satisfactorily accomplish the proposed improvement. **The contract documents are complementary and what is called for by one shall be as binding as if called for by all**. [1]

**ENGINEER**. For publicly owned projects, **the Engineer** is a Professional Engineer licensed in the State of Iowa and **is the authorized representative of the Contracting Authority**. For privately contracted projects, with improvements that are to become publicly owned, **the Engineer** is the Professional Engineer licensed in the State of Iowa and **is the authorized representative of the Jurisdiction** ultimately accepting ownership of the improvement . . . The Engineer may act directly or through duly authorized representatives.

**JURISDICTION.** A governmental entity. . . acting through its governing body, or through the authorized representatives of such governing body when so authorized.

(Supp. Aff. of John A. Markert, Ex. L (Iowa Urban Standard Specifications for Public Improvements Manual-Definitions ("SUDAS Definitions") Section 1.03), Oct. 31, 2012, Docket No. 33 (emphasis added).)

## IV.    THE DISPUTE

On March 23, 2011, Ameron representative Jay Warren spoke by telephone with Snyder's project engineer Chris Pedersen. (Warren Dep. 57:7-8). Snyder and Ameron do not agree as to what was said during that teleconference. Warren maintains that Pedersen initially advised him that Snyder did not consider Ameron pipe "equal to"

---

[1] The reference to "standard specifications" in the definition of contract documents is a reference to the SUDAS. Thus, the SUDAS become a part of any Iowa public works contract formed between a contractor and the contracting authority.

HOBAS pipe, but then had a change of heart and informed him that the pipe would be accepted as equal to HOBAS. (Warren Dep. 57:18-59:15.) Warren also alleges that Pedersen assured him that a written addendum evidencing the approval was not needed. (*Id.*) Warren maintains that Pedersen stated he needed to increase competition among bidders, and implored Ameron to submit a quote to a customer so that Ameron pipe could be used in a contractor's bid. (*Id.*) Finally, Warren claims that he complied with Snyder's request and advised MN Pipe representative Mike Stordahl that Ameron Pipe would be approved for the project. (*Id.*)

Snyder denies that Pedersen ever gave Warren approval. Pedersen testified that he told Warren that Ameron could submit a bid for its product, but that Ameron's pipe would have to be evaluated after the bid to ensure it complied with project specifications. (Markert Aff., Ex. B (Dep. of Chris Pedersen ("Pedersen Dep. B") 152:3-5).)

Stordahl testified that "Jay Warren [of Ameron] told me that Chris Pedersen [of Snyder] had told him that he would not be putting out an addendum for the project but he wanted us to bid it so that the pricing was competitive and that his word was good." (First. Aff. of Bernard (B.J.) Nodzon, Ex 1 (Dep. of Mike Stordahl ("Stordahl Dep.") 69:22-70:1), Aug. 31, 2012, Docket No. 21.) MN Pipe then contacted Hentges and advised Hentges representative Gary Zajac to put in a bid using Ameron pipe, as MN Pipe had been assured by Ameron that the Ameron pipe had been approved as equal to the project's specifications. (Markert Aff., Ex. H (Dep. of Gary Zajac ("Zajac Dep.") 19:1-6).)

Zajac testified that Stordahl told him they "had approval [for] Ameron pipe to be able to be used in the bid and be supplied on the job." (Zajac Dep. 19:3-5.) Still, Zajac was apprehensive about utilizing the Ameron pipe price quote in Hentges' bid because there was no written addendum approving Ameron pipe, and because Snyder had previously announced that it would not accept Ameron pipe for use in the project. (Zajac Dep. 19:12-20:1.) To alleviate Zajac's apprehensiveness, Hentges and MN Pipe agreed orally that if Hentges submitted the bid and Ameron pipe later was not approved, MN Pipe would be liable to Hentges for any difference in cost between Ameron pipe and HOBAS pipe. (*Id.* 76:6-14.) Zajac then submitted the bid based on the Ameron pipe price. (*Id.* 20:17-23.) The bid was awarded to Hentges, and Hentges was therefore obligated to perform the project at the price of the bid. (*Id.* 61:6-12.)

Snyder maintains that multiple engineers reviewed Hentges' bid, eventually concluding that Hentges could not use Ameron pipe, and that HOBAS pipe was required for the project. Thus, Snyder informed Hentges that it had determined that Ameron pipe could not be considered "equal to" HOBAS pipe. (*Id.* 63:6-15.)

Prior to MN Pipe advising Hentges to bid based on the Ameron pipe quote, U.S. Composite, a pipe manufacturer not a party to this action, advised Stordahl that Snyder had approved pipe manufactured by U.S. Composite for use in the project. Stordahl later testified that the only reason that MN Pipe submitted a quote to Hentges using Ameron pipe was that Ameron was the first manufacturer quote to arrive. (Stordahl Dep. 104:12-105:11.) However, Stordahl also maintains that "if Jay Warren would not have represented to me that Snyder & Associates, Inc. had approved Ameron pipe as an

'equal' to HOBAS pipe before the bid, I would not have submitted a quote to Hentges using Ameron pipe." (Aff. of Mike Stordahl ¶ 6, Sept. 20, 2012, Docket No. 29.) In addition, MN Pipe employee Wade Baumberger testified that MN Pipe was working almost exclusively with Ameron at the time of the bid, that MN Pipe and the U.S. Composite had a "falling out," and that MN Pipe was not planning on using the competitor's pipe even though it may have been priced lower than Ameron pipe. (Aff. of William M. Topka, Ex. 7 (Dep. of Wade Baumberger ("Baumberger Dep."), 41:4-14), Sept. 21, 2012, Docket No. 28).

U.S. Composite representative Bob Capkovic testified that it is industry norm for distributors to rely on their manufacturers for guidance as to whether products comply with various project specifications. (Topka Aff., Ex. 5 (Dep. of Bob Capkovic ("Capkovic Dep.") 42:8-43:4).)

Ameron submitted an expert witness report, which lists in detail the general practices and expectations of engineers in the specific bidding process in which Snyder was involved. (Second Nodzon Aff., Ex. 8 at 7.) According to the expert report, Snyder's project manager acted in a manner that was "misleading and might be construed as unethical. In any case, the Project Manager violated the basic rule of telling everyone to submit bids in accordance with the plans and specifications . . . ." (*Id.*)

After being informed that Ameron pipe was not approved for use on the project, Hentges demanded that MN Pipe reimburse it for the price difference between the HOBAS pipe and the Ameron pipe pursuant to their oral agreement. (Stordahl Aff. ¶ 3,

Ex. A.)   MN Pipe reimbursed Hentges in the form of a check for approximately $250,000.  (Zajac Dep. 76:13-25.)

## ANALYSIS

### I.  STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. Of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.   CHOICE-OF-LAW ANALYSIS

In diversity cases, the Court applies the forum state's choice-of-law analysis to determine which state's substantive law will govern. *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595-96 (8th Cir. 2007).  Under Minnesota law, the Court does not conduct a choice of law analysis unless it first "determine[s] that a conflict exists between the laws" of the different states that might govern the issues.  *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 715 F. Supp. 2d 871, 875 (D. Minn. 2010) (*quoting Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000)).  "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." *Nodak*, 604 N.W.2d at 94.  If the Court concludes that there is no actual conflict between the laws of two states, the inquiry proceeds no further and the Court applies the law of the forum. *Best Buy Stores*, 715 F. Supp. 2d at 875-76.

Although Snyder maintains that Iowa law should govern the issues before the Court, Snyder has failed to point to a conflict between Iowa law and Minnesota law, and the Court has not found a conflict.  Because no conflict exists, a full choice-of-law analysis is unnecessary, and the forum state's law should be applied.  The Court will therefore apply Minnesota law.

## III.   AMERON'S MOTION FOR SUMMARY JUDGMENT

### A.   Negligent Misrepresentation

To prevail on a negligent misrepresentation claim, MN Pipe must establish the following elements: (1) Ameron owed MN Pipe a duty of care, (2) Ameron supplied false

information to MN Pipe, (3) MN Pipe justifiably relied upon the false information supplied by Ameron, and (4) Ameron failed to exercise reasonable care in communicating the information. *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012). Additionally, MN Pipe must show that its reliance on the misrepresentation was the proximate cause of its injury, and that it suffered damages as a result. *See Gen. Mktg. Servs., Inc. v. Am. Motorsports, Inc.*, 393 F. Supp. 2d 901, 907 (D. Minn. 2005) (citing *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 350-51 (Minn. App.2001)).

Ameron argues that it is entitled to summary judgment on MN Pipe's negligent misrepresentation claim because Ameron did not owe MN Pipe a duty of care, because it was not justifiable for MN Pipe to rely on Ameron's statements, and because Ameron's statements were not the proximate cause of MN Pipe's injuries. Additionally, Ameron argues that MN Pipe cannot recover on its claim because the representation was about a future event, and because MN Pipe's claim is barred by both the economic loss doctrine and the voluntary payment doctrine.

### 1. The Elements

#### a. Duty of care

The question of whether a duty of care exists in a particular relationship is a question of law. *Summit Recovery, LLC v. Credit Card Reseller, LLC*, Civ. No. 08-5273, 2010 WL 1427322, at *3 (D. Minn. Apr. 9, 2010). For purposes of a negligent misrepresentation claim, certain legal relationships give rise to a duty of care, including accountant/client, attorney/client, and fiduciary relationships involving guardians,

executors, and directors of corporations. *Williams*, 820 N.W.2d at 816. When a relationship is not one of the aforementioned types, a court may still find that a duty of care exists based on the consideration of several factors, including (1) whether the relationship is of a type that supports recognizing a duty of care, (2) whether the defendant has special knowledge or expertise indicative of a special legal relationship, and (3) whether public policy reasons warrant imposing a duty of care on the relationship. *See id.* at 816-19. The relationship between MN Pipe and Ameron has not been recognized by the Minnesota Supreme Court as encompassing a duty of care. Thus, the Court must examine MN Pipe's relationship with Ameron and determine whether "[MN Pipe's] interests are entitled to legal protection against [Ameron]'s conduct." *See id.* at 816.

Ameron attempts to construe its relationship with MN Pipe as that between sophisticated adversaries on opposite sides of an arm's length commercial transaction. The Minnesota Supreme Court has not expressly held that a duty of care cannot exist in an adversarial, arm's length, commercial transaction, *see id.* at 817-18, but the Court has held that this is a factor that cuts against finding a duty of care. *See id.* at 819. Here, the Court finds that even if MN Pipe is a sophisticated party, the relationship between the parties was more collaborative than adversarial. MN Pipe was working closely with Ameron to determine if bidding on the project would be profitable for each party. If Ameron could secure an "equal to" status for its pipe by obtaining Snyder's approval, MN Pipe could quote Ameron pipe to its contractors. If one of MN Pipe's contractors was the low bidder, the contractor would use Ameron pipe and both parties would profit.

Rather than adversaries on opposite sides of a commercial transaction, MN Pipe and Ameron appeared to be allies collaborating closely on a commercial transaction.

Additionally, MN Pipe's relationship with Ameron was one in which Ameron provided guidance with the understanding that MN Pipe was relying on its guidance. *See Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 871-72 (Minn. Ct. App. 1995) (finding that no duty of care existed in part because the defendant was "not supplying information for the guidance of" the plaintiff). According to the record, it was industry norm for distributors to rely on their manufacturers to provide them with accurate information about compliance with project specifications. While MN Pipe knew Ameron pipe did not conform to the written project specifications, it was the manufacturer's responsibility to obtain engineer approval as "equal to" status, and it was Ameron's duty per industry norm to guide MN Pipe as to what the engineer would accept. Ameron had superior knowledge, skills, and information with regard to the engineer's willingness to approve Ameron pipe, and supplied information for MN Pipe's guidance. *See Williams*, at 816-19 (finding that where evidence of one party's superior knowledge or expertise is indicative of a special legal relationship, a duty of care may exist for purposes of a negligent misrepresentation claim).

For these reasons, the Court finds that the nature of the relationship between the parties, Ameron's superior knowledge in obtaining engineer approval, and public policy support recognizing a duty of care. As such, the Court finds that Ameron owed MN Pipe a duty of care.

### b.     False Information[2]

Statements that are predictions about future events are not actionable in Minnesota as negligent misrepresentation claims. *Trooien v. Mansour*, 608 F.3d 1020, 1028-29, 1031 (8th Cir. 2010) (citing *Rognlien v. Carter*, 443 N.W.2d 217, 220-21 (Minn. Ct. App. 1989)). Ameron argues that its statement was a prediction about a future event, and thus not actionable.

Stordahl testified that "if Jay Warren would not have represented to me that Snyder & Associates, Inc. **had approved Ameron pipe as an 'equal'** to HOBAS pipe before the bid, I would not have submitted a quote to Hentges using Ameron pipe." (emphasis added). Stordahl also testified that "Jay Warren [of Ameron] told me that Chris Pedersen [of Snyder] had told him that he would not be putting out an addendum for the project but he wanted us to bid it so that the pricing was competitive and that his word was good." These statements indicate that MN Pipe understood the representations made by Ameron to mean that Snyder had already approved the pipe, not that Snyder would approve it in the future. The Court will not hold, as a matter of law, that MN Pipe's representation was a prediction about a future event.

---

[2] Ameron did not explicitly state that its argument about predictions of future events related to the false information element of MN Pipe's claim, but that seems to be the element that Ameron is attacking. *Cf. Belisle v. Southdale Realty Co.*, 168 N.W.2d 361, 363-64 (Minn. 1969) (holding in a fraud case that representations as to future events were not "false at the time they were made" simply because they did not come true).

## c.    Justifiable Reliance

The question of whether reliance is justifiable for purposes of a misrepresentation claim is generally a question of fact for the jury to decide, not one for the Court to decide on summary judgment. *Minnesota Forest Prods., Inc. v. Ligna Mach., Inc.*, 17 F. Supp. 2d 892, 912 (D. Minn. 1998); *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn.1995).

It is undisputed that Ameron told MN Pipe that Snyder approved Ameron pipe for the project.  Ameron argues that it was not justifiable for MN Pipe to rely on that statement because Ameron disclosed to MN Pipe all of the ways in which its product did not meet the specifications for the project, and because MN Pipe was aware that Ameron pipe did not meet the written project specifications.  However, MN Pipe knew that Snyder's project engineer had sole discretion as to whether to approve Ameron pipe for use in the project.  Additionally, it was industry norm for MN Pipe to rely on its manufacturers' representations about whether their products had been approved by the project engineer.  As such, a reasonable jury could find that MN Pipe's reliance on Ameron's statements was justifiable.

Ameron also argues that MN Pipe did not actually rely on its alleged misrepresentation.  Ameron maintains that MN Pipe had been assured by U.S. Composite that alternative pipes would be approved for the project, and that the only reason MN Pipe quoted Ameron pipe to Hentges was not the alleged misrepresentation, but rather the fact that Ameron's quote was the first to arrive.  In other words, Ameron argues that its statement did not actually induce MN Pipe to advise Hentges to enter a bid, because MN

Pipe would have advised Hentges to enter a bid based on U.S. Composite's pipe if its quote had arrived sooner.

Stordahl testified that MN Pipe would not have submitted a quote to Hentges using Ameron pipe were it not for Ameron's representation that Ameron pipe was approved. In addition, Baumberger testified that MN Pipe was working almost exclusively with Ameron at the time of the bid, that MN Pipe and U.S. Composite had had a "falling out," and that MN Pipe was not planning on using U.S. Composite's pipe. A reasonable jury could conclude from this testimony that Ameron's representation actually induced MN Pipe to bid where it otherwise would not have. The Court will therefore not grant summary judgment on the grounds that MN Pipe did not rely on Ameron's representation or that MN Pipe's reliance was unjustifiable.

### d.     Proximate Cause

Proximate cause exists for purposes of a negligent misrepresentation claim if the negligent conduct was a substantial factor in bringing about the injury. *Flom v. Flom*, 291 N.W.2d 914, 917 (Minn. 1980). Proximate cause is typically a question of fact for the jury. *Wartnick v. Moss & Barnett,* 490 N.W.2d 108, 115 (Minn. 1992). The Court decides proximate cause as a matter of law only where reasonable minds could not disagree on the issue. *Id.*

Ameron maintains that the proximate cause of MN Pipe's damages was not Ameron's representations, but Hentges' failure to make clear in its bid that the bid was based on its assumption that Ameron pipe could be used on the project. The Court finds,

however, that the record could support a jury's finding that the misrepresentations were a substantial factor in MN Pipe's damages. MN Pipe employees testified that they would not have gone forward in the bidding process were it not for Ameron's misrepresentation. At the very least, reasonable minds could differ about whether Ameron's representations satisfied the proximate causation element of the claim. As such, the Court will not grant summary judgment on that basis.

### 2.    Economic Loss Doctrine

Ameron argues that the economic loss doctrine bars MN Pipe's claim. The economic loss doctrine is codified by statute in Minnesota. It provides, in relevant part:

> A buyer may not bring a common law misrepresentation claim against a seller relating to goods sold or leased unless the misrepresentation was made intentionally or recklessly.

Minn. Stat. § 604.101, subd. 4.

However, MN Pipe did not purchase or lease any Ameron pipe from Ameron because Ameron pipe was ultimately deemed not suitable for the project. Therefore, the misrepresentation does not relate to goods that were "sold or leased," and MN Pipe's claim is not barred by Minn. Stat. § 604.101.

### B.    Voluntary payment doctrine

The voluntary payment doctrine provides that one who has knowledge of the material facts and makes a payment voluntarily cannot later recover it on the ground he or she was under no legal obligation to make the payment in the first place. *Best Buy Stores, L.P. v. Benderson-Wainberg Assocs., L.P.*, 668 F.3d 1019, 1030 (8th Cir. 2012)

(quoting *Hanson v. Tele-Commc'ns, Inc.*, Civ. No. C7-00-534, 2000 WL 1376533, at *2 (Minn. Ct. App. Sept. 26, 2000)).  Ameron argues that MN Pipe voluntarily paid Hentges the $247,135 because Hentges was an important customer, and that MN Pipe cannot recover a payment that it was under no legal obligation to make.

The voluntary payment doctrine does not apply here because MN Pipe was under a legal obligation to pay Hentges.  A key premise of the voluntary payment doctrine – that the plaintiff seeks recovery on the ground that it was under no legal obligation to make the original payment – is missing from the present case.  MN Pipe was bound by contract to reimburse Hentges for the difference in price between materials if Snyder rejected the Ameron pipe.  Snyder did reject the Ameron pipe, so MN Pipe was under a legal obligation to make payment to Hentges.  Even if the voluntary payment doctrine were applicable, the doctrine "contains a knowledge component that creates a fact issue that is generally inappropriate for summary judgment."  *Best Buy Stores*, 668 F.3d at 1030-31 (citing *Valspar*, 764 N.W.2d at 367).[3]

## IV.    SNYDER'S MOTION FOR SUMMARY JUDGMENT

### A.    Professional Negligence

The standard for professional negligence actions against engineers is essentially the same as that for negligence –  (1) the existence of a duty to conform to a standard of conduct (2) a failure to conform to that standard, (3) proximate cause, and (4) damages –

---

[3] This case is further distinguishable from a typical voluntary payment doctrine case because MN Pipe is not attempting to recover from the party it gave money to.  Rather, MN Pipe is arguing that a third party, Ameron, is liable to MN Pipe for the payment that MN Pipe made to Hentges.

except that the duty that is owed for engineers is the degree of skill, care, and learning ordinarily possessed by other members of the engineering profession. *Pond Hollow Homeowners Ass'n v. The Ryland Group, Inc.*, 779 N.W.2d 920, 923 (Minn. Ct. App. 2010) (citing *City of Eveleth v. Ruble*, 225 N.W.2d 521, 525 (Minn. 1974)).

Snyder argues that Ameron's expert report fails to establish the degree of skill, care, and learning ordinarily possessed by members of the engineering profession. Specifically, Snyder maintains that the expert report does not state the applicable standard of care for an engineer practicing in the same or similar circumstances as Snyder, and that the report does not state that Pedersen himself breached the standard of care.

The expert report lists in detail the practices and expectations of engineers in bidding processes like the one in the present case. The expert concludes the report by stating: "[Snyder's behavior] . . . is certainly misleading and might be construed as unethical. In any case, the Project Manager [Pedersen] violated the basic rule of telling everyone to submit bids in accordance with the plans and specifications . . . ." The Court finds that Ameron's expert report sufficiently established Snyder's duty of care, and that a reasonable jury could find that Pedersen breached that duty. Thus, the Court will deny Snyder's motion for summary judgment on Ameron's professional negligence claim.

### B.    Negligent Misrepresentation

Justifiable reliance is the only ground upon which Snyder challenges Ameron's negligent misrepresentation claim. Although reliance is generally a question of fact,

*Minnesota Forest Prods.*, 17 F. Supp. 2d at 912; *Nicollet Restoration*, 533 N.W.2d at 848, Snyder points to cases holding that "'reliance on an oral representation is unjustified as a matter of law . . . if the written contract directly contradicts the oral representation.'" *Davidson v. Wilson*, 973 F.2d 1391, 1401 (8th Cir. 1992) (quoting *St. Croix Printing v. Rockwell Int'l Corp.*, 428 N.W.2d 877, 882 (Minn. Ct. App. 1988)). Snyder maintains that Ameron's reliance on Snyder's alleged oral approval[4] was not justified given the written provisions of the SUDAS.[5]

The rule against reliance on oral statements that directly contradict written contracts is not applicable here. First, there was no written agreement between Snyder and Ameron. Although Snyder argues that the oral statement directly contradicted the written provisions of the SUDAS, the SUDAS alone do not constitute a written agreement between the parties. Rather, the provisions of the SUDAS become incorporated into public works contracts when an agreement exists between a contractor and contracting authority to perform services for a public works project. Genuine issues of material fact remain in dispute as to whether Snyder and Ameron had formed such an agreement. As such, the Court will not find as a matter of law that Ameron's reliance on Snyder's statement was unjustifiable.

---

[4] Snyder maintains that its engineer never told Ameron its pipe was approved as "equal to" HOBAS pipe. However, Snyder argues that even if its engineer did make such a representation, Ameron's negligent misrepresentation claim fails as a matter of law.

[5] In its brief, Ameron argued that the SUDAS do not apply to Snyder because they only apply to the jurisdiction, which is Polk County. However, the text of the SUDAS makes clear that they are binding on the city or its representative engineering group. Snyder was Polk County's representative engineering group, and thus the SUDAS do apply to Snyder.

Second, even if there was an agreement in existence between Snyder and Ameron at the time the representation was made, the oral representation was not necessarily a direct contradiction of the provisions of the SUDAS. The SUDAS set forth a detailed process for securing the approval of an alternate product that is not listed in the specifications. That process includes the requirement that a written addendum be issued for the approval of any alternative processes not listed in the specifications. Given Snyder's role as the sole authority in determining whether alternative products or processes were "equal to" HOBAS pipe, the Court will not find as a matter of law that it was a direct contraction for Snyder to assure Ameron orally that the pipe was approved. Snyder is therefore not entitled to summary judgment on the ground that Ameron's reliance was unjustifiable.

### C.    Tortious Interference with Contract

To prevail on a tortious interference with contract claim, Ameron must prove: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. *Minnesota Made Hockey, Inc. v. Minnesota Hockey*, *Inc.*, 761 F. Supp. 2d 848, 861 (D. Minn. 2011) (internal citations omitted).

"The lack of a contract between [the parties] is dispositive of [a] tortious interference claim." *Guinness Imp. Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 613 (8th Cir. 1998). Although the record shows a relationship between Ameron and MN Pipe existed at the time of the alleged misrepresentation, the agreement, if any, between

Ameron and MN Pipe to supply Ameron pipe for the project was not formed until after Snyder's alleged misrepresentation. Snyder cannot be held liable for tortious interference with a contract between Ameron and MN Pipe that did not yet exist at the time of Snyder's alleged misrepresentations. The Court will therefore grant Snyder's motion for summary judgment on Ameron's tortious interference with contract claim.

### D.      Indemnity/Contribution

"Typically, a right to contribution is recognized when two or more persons are liable to the same plaintiff for the same injury and one of the joint tortfeasors has paid more than his fair share of the common liability." *Nw. Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 87–88 (1981). Common law claims for indemnification and contribution are both equitable remedies. *Am. S.S. Co. v. Hallett Dock Co.*, 862 F. Supp. 2d 919, 950 (D. Minn. 2012). Contribution requires that parties "under a common burden share that burden equitably." *A.P.I., Inc. v. Home Ins. Co.,* 706 F. Supp. 2d 926, 946 (D. Minn. 2010) (internal quotation marks omitted). Under Minnesota law, contribution allows one party to recover a proportionate share from the other liable party, whereas indemnity is the right of one party held liable to another to shift the entire burden of liability to a third party also liable for the same harm. *Am. S.S. Co.*, 862 F. Supp. 2d at 950.

Snyder argues that because it is not guilty of any tortious behavior or wrongdoing, it cannot be liable in indemnity or contribution. However, the Court will deny Snyder's motion for summary judgment on both Ameron's professional negligence claim and its

negligent misrepresentation claim. Therefore, it is possible that if Ameron is found liable to MN Pipe for negligent misrepresentation, Ameron may be able to recover from Snyder in either indemnity or contribution. Because genuine issues of material fact remain as to several of the tort claims between the parties, the Court will deny Synder's motion for summary judgment on Ameron's contribution and indemnification claims.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant Ameron's motion for summary judgment [Docket No. 18] is **DENIED**.

2.     Defendant Snyder's motion for summary judgment [Docket No. 22] is **GRANTED in part** and **DENIED in part** as follows:

     a.     Snyder's motion for summary judgment on Ameron's tortious interference with contract claim is **GRANTED**.

     b.     Snyder's motion for summary judgment is **DENIED** in all other respects.

DATED:   April 3, 2013
at Minneapolis, Minnesota.

                    s/ John R. Tunheim
                    JOHN R. TUNHEIM
              United States District Judge